**JEFFERSON LAKE SULPHUR COMPANY, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. A. No. 6879.**

United States District Court
E. D. Louisiana,
New Orleans Division.
May 25, 1962.

Louis F. Oberdorfer, Asst. Atty. Gen., Edward S. Smith, Charles W. Mehaffy, Jerome J. Reso, Jr., Attys., Dept. of Justice, Washington, D. C., Kathleen Ruddell, U. S. Atty., New Orleans, La., for defendant.

AINSWORTH, District Judge.

The taxpayer, Jefferson Lake Sulphur Company, sues for refund of income taxes. The Commissioner of Internal Revenue determined that for purposes of computing its depletion deduction Jefferson Lake should exclude from its gross income the royalty paid by Jefferson Lake to others on sulphur it mined for Texas Gulf Sulphur Company pursuant to a written contract between the two companies. We disagree, and hold that refund should be granted.

On October 25, 1943, Jefferson Lake entered into a mineral agreement with Texas Gulf, subsequently amended May 15, 1950. Production under the agreement commenced June 7, 1946, and has continued without interruption to date. Jefferson Lake was to produce the sulphur, half of which was to be its own and half was to be Texas Gulf's.[1] Jefferson Lake was to pay all of the production costs, including the payment of royalty due and owing under the terms of the various leases.[2] Texas Gulf was to pay cost-reimbursement amounts to Jefferson

Deutsch, Kerrigan & Stiles, Rene H. Himel, Sr., H. Paul Simon, New Orleans, La., for plaintiff.

[1]. Amendment of May 15, 1950 to October 25, 1943 agreement (relevant portions):

"JEFFERSON LAKE agrees that the quantity of sulphur produced and set aside for TEXAS GULF in TEXAS GULF's vat or vats in each quarter shall concurrently be in amounts approximately equal to that so produced and set aside for JEFFERSON LAKE's own account."

[2]. Article II of October 25, 1943 agreement (relevant portions):

"The rights, titles and interest in sulphur in and under the above described lands owned by TEXAS GULF are described and set forth in the agreement first above referred to, dated May 28, 1937, and in the pertinent and applicable several instruments in that agreement referred to as well as in other instruments of record in Fort Bend County, Texas,

vesting title in TEXAS GULF, *all of which are subject to and burdened with certain base and overriding royalties,* payments, duties and obligations in said several instruments provided and with which JEFFERSON LAKE is thoroughly familiar and *expressly assumes,* * * *." (Emphasis added.)

Article VIII of October 25, 1943 agreement (relevant portions):

"All *costs* and expenses of every kind and character incurred in the exploring, developing, mining and producing sulphur from said lands shall be borne solely by JEFFERSON LAKE, *including all base and overriding royalties* and all other costs and expenses incurred in connection with its operations on said lands or any of them, * * *." (Emphasis added.)

Lake with respect to the sulphur mined for Texas Gulf.[3]

█ It is axiomatic that "Only the owner of an economic interest in a property is entitled to depletion on the income derived from production and sale of the oil or gas from that property." Breeding and Burton, Income Taxation of Oil and Gas Production, 1102, ¶ 11.02 (1961). Palmer v. Bender, 287 U.S. 551, 53 S.Ct. 225, 77 L.Ed. 489 (1933); Anderson v. Helvering, 310 U.S. 404, 60 S.Ct. 952, 84 L.Ed. 1277 (1940). (For the legal principles involved, sulphur is treated the same as oil and gas.) Therefore, in order to avoid duplication of depletion deductions, Section 114(b) (4) (A) (iv) of the Internal Revenue Code (1939), 26 U.S.C.A. § 114(b) (4) (A) (iv) expressly requires that "an amount equal to any rents or royalties paid or incurred by the taxpayer" must be excluded from gross income.

Thus, in light of the settled law the question here is whether the payments from Texas Gulf to the taxpayer included reimbursements for royalties paid by Jefferson Lake on sulphur it produced for Texas Gulf, or whether the payments were cost payments and should be excluded from Jefferson Lake's income in computing its depletion allowance. The determination of this question is dependent upon the construction and interpretation of the written contract between Jefferson Lake and Texas Gulf.

Article VIII, of the agreement, in detailing what costs shall be borne by Jefferson Lake, expressly defines the costs involved as, " * * * *including all base and overriding royalties * * *.*" (Emphasis added.) However, Article IX, in providing that Texas Gulf shall pay cost-reimbursement amounts to Jefferson Lake, is less exact and merely refers to "costs," without further definition. Payment of royalty, however, was undoubtedly a cost of production.

█ Jefferson Lake's contention that "costs" as defined in Article VIII is to have the same meaning as the undefined "costs" of Article IX is well founded. "In general, a word used by the parties in one sense is to be interpreted as employed in the same sense throughout the writing in the absence of countervailing reasons." 4 Williston, Contracts, 715–716, § 618 (3d Ed.1961). "* * * [T]he same word occurring more than once is to be given the same meaning unless the context indicates that it was used in a different sense." Midland Valley R. Co. v. Railway Express Agency, 10 Cir., 1939, 105 F.2d 201; accord, Willingham v. Life and Casualty Insurance Co. of Tenn., 5 Cir., 1954, 216 F.2d 226, 47 A.L.R.2d 1017.

█ Since "costs" in Article VIII and "costs" in Article IX are to be given the same meaning the question becomes: Which meaning, that of Article VIII or that of Article IX? If a word is defined in an earlier clause in a contract and not defined in a later clause, the defined meaning will be used in both places. The aim of the court is to determine the intent of the parties and interpret the meaning of the words at the time and place when they were used. Neither the deposition of officers of Texas Gulf nor the affidavit of officers of Jefferson Lake as to the intent of the parties is as persuasive as the terms of the contract itself. The agreement clearly expresses the intention of the parties that the royalties paid by Jefferson Lake on sulphur mined by it for Texas Gulf were to be reimbursed by Texas Gulf.[4]

---

3. Amendment of May 15, 1950 to October 25, 1943 agreement (relevant portions):
   "2. In and as a part of subparagraph (b) of paragraph IX of said agreement of October 25, 1943 are set forth the following contractual obligations:
   " 'On such sulphur produced and set aside for TEXAS GULF in any one producing year, TEXAS GULF, shall pay to

JEFFERSON LAKE, in lieu of any sums determined by an exact computation of *costs* up to and including the loading of such sulphur, agreed sums as follows: * * *.' " (Emphasis added.)

4. The parties stipulated in the record that average cost reimbursement by Texas Gulf to Jefferson Lake on sulphur mined

The determination of the Commissioner of Internal Revenue is in error. Jefferson Lake does not have to exclude the royalties paid on Texas Gulf's sulphur before Jefferson Lake computes its statutory depletion allowance, as a percentage of such income, under Section 114 (b) (4) (A) (iv) of the Internal Revenue Code (1939). The taxpayer is entitled to judgment for $76,455.45 with interest.

This opinion constitutes our findings of fact and conclusions of law as required by Rule 52(a) of Federal Rules of Civil Procedure, 28 U.S.C.A. A judgment for plaintiff will be entered.

by Jefferson Lake for account of Texas Gulf was $9.37 per long ton, and Jefferson Lake's average cost on same, including payment of royalties, was $9.02 per long ton. Jefferson Lake was, therefore, fully reimbursed for all costs. (See Stipulation, paragraph VII.)